**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**CIVIL CASE NO. 1:09cv414**

**RANDY L. SAULMAN,**      )
                                 )
        **Plaintiff,**        )
                                 )    <u>**MEMORANDUM OF**</u>
      **vs.**               )    <u>**DECISION AND ORDER**</u>
                                 )
**MICHAEL J. ASTRUE,**     )
**Commissioner of Social Security,**   )
                               )
       **Defendant.**      )
                               )
_____

**THIS MATTER** is before the Court on the Plaintiff's Motion for Summary Judgment [Doc. 8] and the Defendant's Motion for Summary Judgment [Doc. 10].

## I.  PROCEDURAL HISTORY

The Plaintiff Randy Saulman applied for Supplemental Security Income benefits and a period of disability and Social Security disability insurance benefits on March 31, 2006, alleging that he had become disabled as of March 22, 2006. [Transcript ("T.") 108-110, 113-8, 29]. The Plaintiff's application was denied initially and on reconsideration. [T. 61-6, 70-4, 75-9,]. A hearing was held before Administrative Law Judge ("ALJ") Gregory M.

Hamel on May 7, 2009. [T. 22-56]. On June 17, 2009, the ALJ issued a decision denying the Plaintiff benefits. [T. 10-21]. After accepting additional evidence from the Plaintiff, the Appeals Council denied the Plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner. [T. 1-3]. The Plaintiff has exhausted his available administrative remedies, and this case is now ripe for review pursuant to 42 U.S.C. § 405(g).

## II.    STANDARD OF REVIEW

The Court's review of a final decision of the Commissioner is limited to (1) whether substantial evidence supports the Commissioner's decision, see Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), and (2) whether the Commissioner applied the correct legal standards, Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

The Social Security Act provides that "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). The Fourth Circuit has defined "substantial evidence" as "more than a scintilla and [doing] more than creat[ing] a suspicion of the existence of a fact to be established. It means

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986) (quoting Perales, 402 U.S. at 401, 91 S.Ct. at 1427).

The Court may not re-weigh the evidence or substitute its own judgment for that of the Commissioner, even if it disagrees with the Commissioner's decision, so long as there is substantial evidence in the record to support the final decision below. Hays, 907 F.2d at 1456; Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## III. THE SEQUENTIAL EVALUATION PROCESS

In determining whether or not a claimant is disabled, the ALJ follows a five-step sequential process. 20 C.F.R. §§ 404.1520, 416.920. If the claimant's case fails at any step, the ALJ does not go any further and benefits are denied. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).

First, if the claimant is engaged in substantial gainful activity, the application is denied regardless of the medical condition, age, education, or work experience of the applicant. 20 C.F.R. §§ 404.1520, 416.920. Second, the claimant must show a severe impairment. If the claimant does not show any impairment or combination thereof which significantly limits the claimant's physical or mental ability to perform work activities, then no severe impairment is shown and the claimant is not disabled. Id. Third, if the impairment meets

or equals one of the listed impairments of Appendix 1, Subpart P, Regulation 4, the claimant is disabled regardless of age, education or work experience. Id. Fourth, if the impairment does not meet the criteria above but is still a severe impairment, then the ALJ reviews the claimant's residual functional capacity (RFC) and the physical and mental demands of work done in the past. If the claimant can still perform that work, then a finding of not disabled is mandated. Id. Fifth, if the claimant has a severe impairment but cannot perform past relevant work, then the ALJ will consider whether the applicant's residual functional capacity, age, education, and past work experience enable the performance of other work. If so, then the claimant is not disabled. Id.

## IV.    FACTS AS STATED IN THE RECORD

The facts of record may fairly be summarized as follows. Plaintiff alleges that he is disabled by chest pain, coronary artery disease, congestive heart failure, right ankle conditions and pain, extreme obesity, and depression. He was 43 years old at the time of the ALJ hearing. [T. 108, 27]. He completed the eighth grade and has no GED. [T. 27]. Plaintiff's past relevant work consists entirely of work as an auto mechanic and as owner of a successful mechanic shop. He claims to have last worked in 2006 when the routine stress of running an auto shop began to aggravate him and he could no longer supervise others. [T. 41-2, 49].

Plaintiff testified that for decades he had worked with an artificial elbow joint in his left arm that only allowed him to straighten his arm three-fourths of the way. [T. 42-3]. He testified that he experiences cramping and problems holding things in his left hand. [T. 44]. He did not indicate any problems with his right hand.

In July 2003, Plaintiff began experiencing spontaneous pain in his left ankle. He previously had broken that ankle and as a teenager had developed an intermittently symptomatic mass in that joint. [T. 210]. Following an x-ray, he was diagnosed with osteoarthritis. [T. 182]. In November 2003, Plaintiff fractured his right ankle when a log rolled over it. [T. 210]. He underwent surgery to repair the fracture, but developed a postoperative wound infection [T. 208] and had severe chronic pain thereafter. [T. 186]. He began receiving Medicaid benefits due to this ankle injury. [T. 30].

He first complained of right leg pain, of a year's duration, to his family doctor on November 15, 2004. [T. 685]. He was prescribed Percocet and referred to a pain clinic, which he visited in January 2005. On initial examination, the pain specialist noted the Plaintiff had a shuffling gait favoring the right leg, some difficulty with weightbearing on the right leg, diffuse swelling of the right ankle with no sign of infection, hypesthesis and some numbness. He noted that the left ankle was disfigured from a remote fracture,

but that it did not cause as much pain as the right. At that time, the Plaintiff rated his pain as averaging four to five on a ten point scale, and eight out of ten at worst. The pain specialist prescribed methadone for pain. [T. 192-3].

From 2005 to 2009, the Plaintiff was treated by Dr. William Geideman for his right ankle injury. [T. 644-50, 715-732]. In a visit in January 2005, Dr. Geideman noted that the Plaintiff reported constant right leg pain, as distinguished from his localized ankle pain and occasional foot pain. Dr. Geideman prescribed compression stockings. [T. 650]. There are no further appointments with Dr. Geideman that appear of record during 2006 and most of 2007.

Plaintiff next saw Dr. Tally Eddings of Blue Ridge Bone and Joint in May 2005. He reported that four months prior, a pipe fell on his right ankle, hitting the surgical incision and creating a small draining wound that remained unhealed. Dr. Eddings diagnosed the Plaintiff with chronic osteomyelitis and recommended a tibiotalar fusion. [T. 208]. On May 2, 2005, Dr. Eddings noted a mass in the left ankle approximately five centimeters in size, which was diagnosed as a ganglion cyst. [T. 210-1]. On June 9, 2005, the Plaintiff underwent irrigation and debridement and removal of hardware from the prior surgery on the right ankle, in an effort to heal the open wound. [T. 212-3, 219-220]. Dr. Eddings consistently warned the Plaintiff to stop smoking, so that

it could heal. While the Plaintiff did cut back on smoking, he did not quit completely. [T. 218]. The wound did not heal, and ultimately he was referred to a Dr. Humphrey for wound care. [T. 218]. No treatment records from Dr. Humphrey, however, appear in the record.

On January 3, 2007, the Plaintiff was seen by John Sallstrom, PA-C, at Burke Primary Care for complaints of bilateral ankle pain. Both ankles were noted as being swollen and tender. He was prescribed Voltaren XR 100 mg and Percocet 7.5/500 with no refills. [T. 679]. On May 3, 2007, he told Mr. Sallstrom that his ankle pain was worsening such that he had been unable to work or drive a race car for several months.[1] Percocet and Voltaren were continued, along with Ultram, through March 2008. [T. 678, 671].

In December 2007, Plaintiff returned to Dr. Geideman. At that time, he reported his ankle had become more painful. On examination, Dr. Geideman noted that the right ankle was moderately swollen, was markedly tender across the anterior joint line, and was painful on flexion. Dr. Geideman prescribed a solid ankle brace to help with walking pain. [T. 648-9]. In August 2008, the Plaintiff reported to Mr. Sallstrom that while the ankle brace helped initially, his pain was getting worse. [T. 645, 725]. Mr. Sallstrom increased his

---

[1]As previously noted, the Plaintiff testified that he has not been able to work since 2006.

Percocet dosage in August 2008. [T. 669]. In October 2008, Mr. Sallstrom provided a disability opinion [T. 654] and a Medical Assessment of Ability to Do Work-Related Activities (Physical) [T. 655-660] opining that the Plaintiff is "severely disabled." [T. 654].

In 2007 and 2008, the Plaintiff accepted two steroid injections for pain in his ankle but refused the only other significant available treatment, ankle fusion surgery, due to his child care responsibilities. [T. 646, 648, 644]. Eventually, however, the Plaintiff consented to surgery, which was performed in March 2009. [T. 723, 713-4]. He was advised to elevate his leg as much as possible in order to prevent swelling and drainage. [T. 720]. By April 22, 2009, Plaintiff's failure to keep the leg elevated resulted in enough swelling that the skin blistered. [T. 717]. On April 29, 2009, healing from the surgery was noted as slow. He was placed in a non-weightbearing cast, which was scheduled to be removed in about a week. [T. 715]. There is no mention in the medical records of a prescription for a wheelchair or other assistive device at that time.

The Plaintiff's hearing before the ALJ took place on May 7, 2009. At the hearing, the Plaintiff testified that his ankle hurt all the time, with the worst pain being an intermittent stabbing pain that lasted a minute or two. [T. 46]. He stated that the pain felt like someone sticking a knife in the side of his foot,

and that he experienced pain both sitting and standing. [T. 34, 47]. He further testified that pain medications did not help alleviate the pain. [T. 35]. The Plaintiff was using a wheelchair at the hearing and reported using crutches from time to time. He testified that he could stand for 20 or 30 minutes at a time, after which he would have to lay down to prop up his right leg and could not stand again for the rest of the day. [T. 46].

The Plaintiff sought treatment from Dr. Andrew Ross of Hickory Cardiology Associates, PLLC, from 2006 to 2008 for coronary artery disease. [T. 221-238, 332-343, 374-389, 390-91, 459-487, 581-643]. The Plaintiff was hospitalized five times during this time period for chest pain and shortness of breath. During these hospitalizations, he received a total of eight stents to treat his coronary artery disease. [T. 239-297, 298-331, 440-458, 513-527]. It was noted in an April 2006 visit to Dr. Ross that he continued to work. [T. 224]. Dr. Ross repeatedly warned him to lose weight, manage his diabetes, and stop smoking. He consistently noted the complications to Plaintiff's coronary artery disease brought on by his congestive heart failure, diabetes mellitus, hypertension, and hyperlipidemia.

On September 5, 2006, a stress test was administered in which no ischemia was found. [T. 390]. On October 18, 2006, Dr. Ross's notes suggest that the Plaintiff was still working as a mechanic. [T. 459]. On

January 23, 2007, Dr. Ross noted that the Plaintiff had edema in his ankles and chest pain; at that time, the Plaintiff weighed 324 pounds. [T. 619-622]. Dr. Ross's notes again suggest that the Plaintiff was still gainfully employed. [T. 619, 621-2, 479].

By February 2007, the Plaintiff reported to Dr. Ross that he was free of chest pain. [T. 615]. He further reported that he was working twenty hours per week. [T. 616]. Dr. Ross performed another stress test, which produced shortness of breath but no chest pain and which showed evidence of a prior myocardial infarction, but no ischemia. [T. 608, 481, 485]. In May 2007, the Plaintiff reported to Dr. Ross that he was "doing his usual job, which is yard work, and feeling fine doing it." He had no complaints of chest pain or shortness of breath, and it was noted that he had well-controlled blood pressure. [T. 603-4]. In a visit in November 2007, the Plaintiff complained of quite a bit of lower extremity pain, but no chest pain or shortness of breath. [T. 600].

Plaintiff underwent a physical evaluation by Dr. Bryan Loeffler of Disability Determination Services (DDS) on December 21, 2006. [T. 398-403]. Dr. Loeffler noted that the Plaintiff had limited range of motion in his right elbow as well as both ankles. [T. 398].

Plaintiff underwent a mental health evaluation by Dr. Anthony Carraway

for DDS on January 1, 2007. [T. 392-6]. He reported having a grumpy and gloomy mood, being easily upset, sleeping no more than three hours at a time, and having no energy. He described his activities as "dealing with an old house, picking up." He reported that it was difficult to put socks on. Dr. Carraway noted that the Plaintiff appeared to be in some degree of pain. Plaintiff was assessed with a Global Assessment of Functioning (GAF) score of 59 and a mood disorder due to chronic medical illness with depressive symptoms. Dr. Carraway opined that Plaintiff's physical problems would limit his persistence at simple repetitive tasks, and that he had moderate impairment of short-term memory and stress tolerance.

A Psychiatric Review Technique [T. 416-429] and a Mental Residual Functional Capacity Assessment were performed on January 17, 2007 by Michael Hammonds, Ph.D. [T. 412-5]. Dr. Hammonds concluded that Plaintiff was capable of following simple instructions, maintaining attention and concentration to completion of uncomplicated tasks, no extensive public contact or social interaction, and adapting to routine changes in the workplace. [Id.].

## V.    THE ALJ'S DECISION

On June 17, 2009, the ALJ issued a decision denying the Plaintiff's claim. [T. 10-21]. Proceeding to the sequential evaluation, the ALJ found that

the Plaintiff had a date last insured of June 30, 2011, and that he had not engaged in any substantial gainful activity since March 22, 2006, his alleged onset date. [T. 12]. The ALJ then found that the medical evidence established the following as severe impairments: status post-trimalleolar fracture of the right ankle with history of fusion surgery; atherosclerotic heart disease (status post-multiple stent placement surgeries) with history of congestive heart failure; obesity; and a mood disorder. [T. 12]. He found Plaintiff's reflux esophagitis, hyperlipidemia, hypertension, diabetes mellitus, and history of left elbow injury to be non-severe. [T. 12]. The ALJ concluded that his impairments did not meet or equal a listing. [T. 13]. He then assessed Plaintiff's residual functional capacity and determined that he retains the capacity to perform sedentary work with limitations to routine and repetitive tasks only; no climbing ropes, ladders or scaffolds; occasional climbing of stairs, bending, kneeling, crawling, crouching and stooping; and no exposure to hazardous environments or moving equipment. [T. 14]. He found that Plaintiff could not perform his past relevant work. [T. 19]. He found that Plaintiff was a younger individual with limited education, and transferability of skills was not material. [T. 19].

The ALJ then determined that jobs did exist in significant numbers which Plaintiff could perform. [T. 20]. Accordingly, the ALJ concluded that the

Plaintiff was not "disabled" as defined by the Social Security Act from the alleged onset date of March 22, 2006. [T. 21].

## VI. DISCUSSION

Plaintiff argues that the ALJ improperly evaluated his obesity, failed at step four to give a reasoned evaluation of his exertional limitations, and improperly evaluated his pain and symptoms.

### A. The ALJ properly evaluated Plaintiff's obesity in accordance with SSR 02-1p and his findings were supported by substantial evidence.

Plaintiff first asserts that the ALJ failed to analyze properly the effect of his obesity upon his ability to perform substantial gainful activity. Specifically, the Plaintiff contends that the ALJ failed to consider his obesity in determining whether his impairments met or medically equaled listing 4.04(C).

An ALJ is to consider a claimant's obesity throughout the sequential process. Soc. Sec. Ruling (SSR) 02-1p at *3. "[O]besity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing." Id. at *4.

In order to satisfy subsection "C" of listing 4.04, an individual must have both (1) angiographic evidence demonstrating a specified narrowing of the coronary artery or bypass graft vessel, and (2) evidence demonstrating very serious limitations in the ability to independently initiate, sustain, or complete

activities of daily living. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Section 4.04(C).

In the present case, the ALJ considered the evidence of record and found that

Plaintiff's "coronary artery disease [did] not meet Section 4.04, as the specific

angiographic evidence required [wa]s not present." [T. 13]. The Plaintiff does

not contest the ALJ's finding that he lacked the angiographic evidence needed

to meet the listing. Rather, the Plaintiff focuses on the second prong of

Section 4.04(C), arguing that he has a very serious limitation in his ability to

independently initiate, sustain, or complete activities of daily living. [Doc. 8-1

at 4].

Even if Plaintiff had the angiographic evidence sufficient to satisfy the

first element of listing 4.04(C), the medical evidence of record demonstrates

that he does not have very serious limitations with respect to his ability to

independently initiate, sustain, and complete tasks. In this regard, the ALJ

affirmatively considered Plaintiff's ability to perform daily living activities and

found him to be only mildly impaired. [T. 14]. Specifically, the ALJ found that

Plaintiff was capable of:

> preparing meals for himself, performing some
> household chores (with the assistance of his ex-wife),
> driving, and grocery shopping. Moreover, [Plaintiff]
> indicated to Bryan J. Loeffler, M.D., a consultative
> examining physician, in December 2006 that he was
> able to dress and feed himself, drive a car, and
> perform some household chores. [Plaintiff] also
> reported to a consultative evaluating physician in

14

> January 2007 that he had custody of his seven-year
> old daughter.

[T. 13-14 (citations omitted)]. As noted by the ALJ,"[c]hild care, by its very nature, requires a certain degree of physical activity as well as the ability to sustain attention and perform other mental functions." [T. 16]. Thus, even if Plaintiff had presented angiographic evidence to satisfy the first prong of 4.04(C), there is substantial evidence in the record to support the ALJ's finding that the Plaintiff was not significantly limited with respect to his ability to initiate, sustain, or complete tasks as required by the listing.

Plaintiff next asserts that the ALJ failed to follow SSR 02-1p at step four in two ways. First, he argues that the ALJ failed to analyze the effect of Plaintiff's obesity on his ability to sustain work activities, i.e., the non-exertional effects of obesity. Second, he argues that the ALJ failed to analyze the effect of his obesity on required work movements, i.e., the effects of obesity on exertional work functions.

> Obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards

15

> may also be affected.  The effects of obesity may not
> be obvious.  For example, some people with obesity
> also have sleep apnea.  This can lead to drowsiness
> and lack of mental clarity during the day.  Obesity
> may also affect an individual's social functioning.

SSR 02-1p at *6.

In the present case, the ALJ properly considered the limitation of function caused by the Plaintiff's obesity in determining the Plaintiff's RFC. The ALJ affirmatively considered SSR 02-1p and found that Plaintiff could "sustain consistent function," except for problems unrelated to his obesity, namely his ankle injury.  [T. 18].  The ALJ further noted that the evidence did not support a finding that Plaintiff suffered from sleep apnea or fatigue as a result of his obesity, and Plaintiff points to no specific contrary evidence of sleep apnea or resulting fatigue.  [T. 18].  Therefore, the ALJ properly concluded that the medical evidence did not show that Plaintiff's obesity had a negative effect on his ability to sustain function over an eight-hour day beyond the limitations set forth in his RFC.

The ALJ further considered the Plaintiff's ability to ambulate and make required work movements.  Specifically, the ALJ took into account Plaintiff's difficulty in bending the fingers of his left hand when posing the hypothetical to the vocational expert.  He further adopted the physician assistant Sallstrom's findings regarding the Plaintiff's limitations in sitting, standing, and

lifting. The ALJ also took note that Plaintiff could not stand for more than 20 to 30 minutes and needed an assistive device to ambulate. [T. 15]. He further noted, however, that Plaintiff was not required to use a wheelchair and only elected to do so because it was easier than using crutches. [T. 13]. The ALJ also considered the fact that Plaintiff's condition was projected to improve within six to eight weeks of the administrative hearing and that he would not require an assistive device in the future. [Id.]. The ALJ also properly considered the report of Dr. Loeffler, who noted that although Plaintiff ambulated with a slow antalgic gait, he did not require the use of an assistive device. [T. 401]. Dr. Loeffler further noted that Plaintiff was able to get on and off of the exam table and up and out of his chair without difficulty. [T. 401]. The ALJ further noted that in July 2008, the Plaintiff had no deformities, clubbing, cyanosis or edema and only "some" lower extremity weakness and 1+ pre-tibial edema. [T. 584]. Therefore, the ALJ did consider Plaintiff's ability to perform work required movements and did not find that his obesity restricted him beyond the limitations already set forth in his RFC.

For these reasons, the Court concludes that the ALJ's evaluation of the Plaintiff's obesity followed applicable law, and that his findings of fact are supported by substantial evidence.

**B**.  **The ALJ's analysis of Plaintiff's pain and symptoms followed applicable law and was supported by substantial evidence.**

Plaintiff next argues that the ALJ improperly evaluated his complaints of pain and symptoms. Specifically, he challenges the ALJ's reliance on miscellaneous daily activities that he performed, on physician reports that he was in "no acute distress," and on his failure to quit smoking and lose weight as improper bases for credibility findings. [Doc. 8-1 at 8].

The determination of whether a person is disabled by non-exertional pain or other symptoms is a two-step process. "First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." Craig v. Chater, 76 F.3d 585, 594 (4th Cir.1996) (citing 20 C.F.R. § 416.929(b); § 404.1529(b); 42 U.S.C. § 423(d)(5)(A)). If there is such evidence, then the ALJ must then evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects his ability to work." Id. at 595 (citing 20 C.F.R. § 416.929(c)(1) and § 404.1529(c)(1)).

Having found as severe conditions that could be expected to cause pain, the ALJ's decision pointed out numerous inconsistences between the reported severity of his limitations and objective medical findings. [T. 17-9]. The ALJ amply discussed inconsistencies in Plaintiff's own reports. [T. 15-19].

For example, the ALJ noted Plaintiff's claims that he experienced dizziness but this was reflected in none of the medical reports.[T. 16]. He further contrasted the evidence of Plaintiff's frequent driving with his reports of great pain and extremely limited range of motion in his right ankle. [T. 18].

As to Plaintiff's argument that the ALJ improperly ignored evidence of how pain affects his concentration, Plaintiff's evidence was that he cannot "keep his mind on what [he is] doing." [T. 47]. The ALJ "agreed with" [T. 18] Mr. Sallstrom's opinion that "his use of chronic narcotic limit his mental capabilities," including concentration, and he incorporated into his RFC assessment the State Agency's opinion that Plaintiff had moderate limitations on concentration and could concentrate only on uncomplicated tasks. [T. 19].

The ALJ noted Plaintiff's daily activities, including household chores and caring for his daughter. [T. 16]. Contrary to Plaintiff's argument that his ex-wife performed most of these duties, the record indicates that his ex-wife performed household chores only occasionally, and it is noted in the medical records that the Plaintiff initially refused ankle fusion due to his child care responsibilities. [T. 31-2, 644, 646, 648]. Additionally, numerous physician records indicate that Plaintiff worked well past his alleged date of onset.

The ALJ also discussed Plaintiff's non-compliance with treatment for major health risk factors, smoking and diet. [T. 16]. "In considering the

credibility of the claimant's subjective allegations of pain, the ALJ must consider (factors which include) the extensiveness of the attempts (medical or nonmedical) to obtain relief...." McKenney v. Apfel, 38 F.Supp.2d 1249, 1259 (D. An. 1999) (citing Hargis v. Sullivan, 945 F.2d 1482, 1490 (10th Cir. 1991)).

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). Plaintiff points to no evidence that reconciles the inconsistencies found by the ALJ. The record amply supports his findings of fact. Given the deference due to the ALJ's credibility determination, the Court finds that the ALJ's analysis of pain and symptoms at step four followed applicable law and was supported by substantial evidence.

## VII.   CONCLUSION

For the foregoing reasons, the Court concludes that the ALJ applied the correct legal standards, and that there is substantial evidence to support the ALJ's finding of no disability through the date of his decision.

## O R D E R

Accordingly, **IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 10] is **GRANTED**.

**IT IS FURTHER ORDERED** that the Plaintiff's Motion for Judgment on the Pleadings [Doc. 8] is **DENIED**.

A judgment shall be entered simultaneously herewith.

**IT IS SO ORDERED.**

Signed: September 16, 2011

Martin Reidinger
United States District Judge